**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| EVAN FAIN, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 10-cv-628 (RCL) |
| | ) | |
| ISLAMIC REPUBLIC OF IRAN, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM OPINION**

**I.    INTRODUCTION**

This action arises out of the devastating 1983 bombing of the U.S. Marine barracks in

Beirut, Lebanon.  The attack decimated the facility, killed 241 U.S. servicemen and left countless

others wounded, and caused physical and emotional injuries to plaintiff Evan Fain III.  Mr.

Fain's wife and children are also plaintiffs in this suit against defendants Islamic Republic of

Iran ("Iran") and the Iranian Ministry of Information and Security ("MOIS").  This action is

brought pursuant to the state-sponsored terrorism exception of the Foreign Sovereign Immunities

Act ("FSIA"), 28 U.S.C. §§ 1330, 1602 *et seq*., which was enacted as part of the National

Defense Authorization Act for Fiscal Year 2008 ("NDAA").  Pub. L. No. 110-181, § 1083, 122

Stat. 3, 338–44 (2008).  That provision, codified at 28 U.S.C. § 1605A, provides "a federal right

of action against foreign states." *Simon v. Islamic Republic of Iraq*, 529 F.3d 1187, 1190 (D.C.

Cir. 2008).  Plaintiffs contend that, by both creating and supporting the terrorist organization

Hezbollah and directing that organization to take 'spectacular action against the United States

Marines' stationed in Lebanon, defendants are legally responsible for the severe physical and

emotional toll that the barracks bombing wreaked upon them.  For the reasons set forth below, the Court finds that plaintiffs have provided sufficient proof to support their causes of action, and determines that defendants are liable under FSIA's state-sponsored terrorism exception.

## II.   PROCEDURAL HISTORY

### A.      Prior Beirut Bombing Litigation

There is a lengthy history of litigation before this Court concerning the 1983 bombing of the U.S. Marine barracks in Beirut.[1]  In the seminal case, *Peterson v. Islamic Republic of Iran*, dozens of plaintiffs consisting of family members of the 241 deceased servicemen, as well as several injured survivors of the attack, sued defendants Iran and MOIS, seeking to hold them liable for the horrific act under the former state-sponsored terrorism exception, which at that time was codified at 28 U.S.C. § 1605(a)(7).  264 F. Supp. 2d 46, 48 (D.D.C. 2003) (Lamberth, J.).  Over two days in March 2003, the Court conducted a bench trial during which it heard testimony from lay and expert witnesses and received documentary evidence concerning the horrific attack, the grave injuries many suffered, defendants' involvement in the bombing, and their support for international terrorism more broadly.  *See generally id*. at 48–59 (discussing evidence and findings of fact).  Based on that evidence, the Court found "that it is beyond question that Hezbollah and its agents received massive material and technical support from the Iranian government. . . . [and] that it is highly unlikely that this attack could have resulted in such loss of life without the assistance of regular military forces, such as those of Iran."  *Id*. at 58.  The Court then determined, as a legal matter, that "MOIS actively participated in the attack" and was

---

[1] *See Peterson v. Islamic Republic of Iran*, 264 F. Supp. 2d 46 (D.D.C. 2003) (Lamberth, J.); *Valore v. Islamic Republic of Iran*, 478 F. Supp. 2d 101 (D.D.C. 2007) (Lamberth, J.); *In re Islamic Republic of Iran Terrorism Litigation*, 659 F. Supp. 2d 31 (D.D.C. 2010) (Lamberth, C.J.); *Anderson v. Islamic Republic of Iran*, 753 F. Supp. 2d 68 (D.D.C. 2010) (Lamberth, C.J.); *Bland v. Islamic Republic of Iran*, 2011 WL 6396527 (D.D.C. 2011) (Lamberth, C.J.); *O'Brien v. Islamic Republic of Iran*, 2012 WL 1021471 (D.D.C. 2012) (Lamberth, C.J.); *Davis v. Islamic Republic of Iran*, 2012 WL 1059700 (D.D.C. 2012) (Lamberth, C.J.).

"acting as an agent of . . . Iran" when doing so, and thus defendants Iran and MOIS were "jointly and severally liable to the plaintiffs" for damages. *Id*. at 61. The Court left the determination of damages in *Peterson* to another day following further findings of fact by special masters appointed to assist the Court. *Id*. at 65. Subsequent to the opinion in *Peterson*, several other cases related to the 1983 attack, including this one, remained pending before this Court.

### B.     This Action

Plaintiffs here are serviceman Fain, his wife Maria, and their three children. In the Complaint, plaintiffs allege the same essential facts concerning the 1983 barracks bombing that were established by sufficient evidence in *Peterson*, Compl. ¶¶ 6–10. Plaintiffs set forth claims for assault, battery, intentional infliction of emotional distress, and punitive damages against the defendants. *Id*. at ¶¶ 11–19.

Plaintiffs served copies of the relevant papers, along with translations, by diplomatic channels through the U.S. Department of State, as required by 28 U.S.C. § 1608(a)(4). According to the diplomatic note, service was effected August 3, 2011. Return of Service/ Affidavit, October 19, 2011 [ECF No. 13]. Under the terms of 28 U.S.C. § 1605A, defendants had 60 days from that date—until October 2, 2011—to respond. 28 U.S.C. § 1608(d). After none of the defendants appeared or responded, the Clerk of the Court entered default on plaintiffs' behalf. Clerk's Entry of Default, Oct. 28, 2011 [ECF No. 27]. Plaintiffs then moved for this Court to take judicial notice of the proceedings in *Peterson* and for default judgment in accordance with § 1608(e). Motion for Default Judgment, Oct. 28, 2011 [ECF No. 26]. Based on that motion, the record, and facts available for judicial notice, the Court makes the following findings of fact and conclusions of law.

## III.    FINDINGS OF FACT

The Clerk of the Court entered defendants' default on October 28, 2011.  However, prior to entry of final default judgment, the FSIA requires that courts evaluate the evidence before them to ensure that plaintiffs have established their right to relief "by evidence that is satisfactory to the court."  28 U.S.C. § 1608(e).  This requirement "imposes a duty on FSIA courts to not simply accept a complaint's unsupported allegations as true, and obligates courts to inquire further before entering judgment against parties in default."  *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 171 (D.D.C. 2010) (internal quotations omitted).

In considering whether to enter default judgment, courts in FSIA cases look to various sources of evidence to satisfy their statutory obligation.  Courts may, for example, rely upon plaintiffs' "'uncontroverted factual allegations, which are supported by . . . documentary and affidavit evidence.'"  *Valore*, 700 F. Supp. 2d at 59 (alteration in original; quoting *Int'l Road Fed'n v. Democratic Republic of the Congo*, 131 F. Supp. 2d 248, 252 n.4 (D.D.C. 2001)).  In addition to more traditional forms of evidence—testimony and documentation—plaintiffs in FSIA cases may also submit evidence in the form of affidavits.  *Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d 40, 53 (D.D.C. 2006) (citing *Bodoff v. Islamic Republic of Iran*, 424 F. Supp. 2d 74, 82 (D.D.C. 2006)).  Finally, a FSIA court may "'take judicial notice of related proceedings and records in cases before the same court.'"  *Valore*, 700 F. Supp. 2d at 59 (quoting *Brewer v. Islamic Republic of Iran*, 664 F. Supp. 2d 43, 50–51 (D.D.C. 2009)).  Here, plaintiffs rely on judicial notice, affidavits, and depositions in support of their motion for default judgment.

## A.      Judicial Notice of Prior Related Cases

Under the Federal Rules of Evidence, courts are permitted to take judicial notice of facts "not subject to reasonable dispute" where those facts are either "generally known within the territorial jurisdiction" or are "capable of accurate and ready determination by resort to sources

whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).  This rule permits

courts to take judicial notice of court records in related proceedings.  29 Am. Jur. 2d *Evidence* §

151 (2010); *see also Booth v. Fletcher*, 101 F.2d 676, 679 n.2 (D.C. Cir. 1938) ("A court may

take judicial notice of, and give effect to, its own records in another but interrelated proceeding .

. . ."); 2 McCormick on Evid. § 332 (6th ed. 2009) (noting that the principle permitting courts to

take judicial notice of current proceedings "is equally applicable to matters of record in the

proceedings in other cases in the same court").  Because of the multiplicity of FSIA-related

litigation, courts in this District have frequently taken judicial notice of earlier, related

proceedings.  *See, e.g.*, *Murphy*, 740 F. Supp. 2d at 58; *Valore*, 700 F. Supp. 2d at 59–60;

*Brewer*, 664 F. Supp. 2d at 50–51 (D.D.C. 2009).

     A difficult issue arises concerning judicial notice of related proceedings with regard to

courts' prior factual findings.  While such findings in a prior proceeding are "capable of accurate

and ready determination" from judicial records, Fed. R. Evid. 201(b), it cannot be said that these

same findings are "not subject to reasonable dispute."  *Id.*  Specifically, such findings represent

merely a court's probabilistic determination as to what happened, rather than a first-hand account

of the actual events.  As such, they constitute hearsay, and thus are considered inadmissible.

*Athridge v. Aetna Cas. & Sur. Co.*, 474 F. Supp. 2d 102, 110 (D.D.C. 2007) (citing *United States

v. Jones*, 29 F.3d 1549, 1554 (11th Cir. 1994)).

     This Court grappled with these difficulties in *Rimkus*, where— "mindful that the statutory

obligation found in § 1608(e) was not designed to impose the onerous burden of re-litigating key

facts in related cases arising out of the same terrorist attack," 750 F. Supp. 2d at 163 (citing

*Brewer*, 664 F. Supp. 2d at 54)—determined that the proper approach is one "that permits courts

in subsequent related cases to rely upon the evidence presented in earlier litigation . . . without

5

necessitating the formality of having that evidence reproduced." *Id.* (citing *Murphy*, 740 F. Supp. 2d at 58). Thus, based on judicial notice of the evidence presented in the earlier cases—here, *Peterson*—courts may reach their own independent findings of fact.

### B.     Relevant Findings of Fact

This action arises out of the devastating 1983 bombing of the U.S. Marine barracks in Beirut, Lebanon—an event that has been at the center of numerous FSIA suits. In support of their claims, plaintiffs ask this Court to take judicial notice of its previous findings in the *Peterson* case, during which the Court held a two-day bench trial on the issue of liability. 264 F. Supp. 2d at 48–49. Bearing in mind the parameters for judicial notice in FSIA actions set forth above, the Court takes judicial notice of the evidence presented in *Peterson*, and renders the following findings of fact:

*Defendants*

Defendant Iran "is a foreign state and has been designated a state sponsor of terrorism pursuant to section 69(j) of the Export Administration Act of 1979, 50 U.S.C. § 2405(j), continuously since January 19, 1984." *Blais*, 459 F. Supp. 2d at 47. Defendant MOIS is the secret police and intelligence organization of Iran. In *Valore*, this Court characterized MOIS as a "division of the state of Iran" that "acted as a conduit for the Islamic Republic of Iran's provision of funds to Hezbollah." 700 F. Supp. 2d at 53, 65.

*The Attack on the Marine Barracks*

Documentary evidence presented to this Court in *Peterson* establishes that in late 1982, the 24th Marine Amphibious Unit of the U.S. Marines—which included 1st Battalion, 8th Marines—was dispatched as part of an international peacekeeping coalition to the Lebanese capital of Beirut. *Peterson*, 264 F. Supp. 2d at 49. The rules of engagement issued to the

6

servicemen in this unit clearly stated that they "possessed neither combatant nor police powers." *Id*. Indeed, numerous witnesses at the *Peterson* trial testified that these servicemen "were more restricted in their use of force than an ordinary U.S. citizen walking down a street in Washington, D.C." *Id*. at 50. As Colonel Timothy Geraghty, the commander of the U.S. deployment testified: "The rules—these were geared primarily again with the peacekeeping mission [in mind] and the sensitivities of killing or maiming someone accidentally." *Id*. (alteration in original). Given the nature of this deployment, the Court finds that the servicemen were non-combatants operating under peacetime rules of engagement.

During the *Peterson* trial, the Court heard the videotaped deposition of a Hezbollah member known by the pseudonym "Mahmoud." 264 F. Supp. 2d at 54. Mahmoud is a Lebanese Shi'ite Muslim, and was part of the group that carried out the attack on the Marine barracks in 1983. He provided the following information concerning the planning and execution of the bombing:

In 1983, high-ranking members of Hezbollah and a member of the Iranian Revolutionary Guard Corps, acting at the direction of the Iranian Ambassador to Syria, met in Baalbek, Lebanon. *Id*. at 55. At this meeting, the individuals "formed a plan to carry out simultaneous attacks against the American and French barracks in Lebanon." *Id*. Subsequent to these discussions, members of Hezbollah disguised a 19-ton truck to resemble a water delivery truck that regularly traveled to the Beirut International Airport, near the U.S. Marine barracks, and rigged the truck so that it could carry an explosive device. *Id*. at 56. On the morning of October 23, 1983, a group of Hezbollah operatives ambushed the real water delivery truck, and the fake truck was sent to the barracks, driven by an Iranian member of Hezbollah. Upon reaching the barracks, the fake truck increased its speed and broke through the wire and sandbag barriers

surrounding the facility.  Once the truck reached the center of the barracks, the bomb it carried

was detonated.  *Id*.

The *Peterson* Court also received substantial testimony concerning the explosion and its

aftermath.  Danny A. Defenbaugh, the on-scene FBI forensic explosive investigation, testified as

an expert before the Court and explained that the explosion was, at the time, "the largest non-

nuclear explosion that had ever been detonated on the face of the Earth," with a force that "was

equal to between 15,000 to 21,000 pounds of TNT."  *Id*.  Steve Russell, the sergeant of the guard

at the time of the attack, stated that the bomb left many victims mangled and in severe pain.  *Id*.

at 58.  In all, the attack on the barracks killed 241 U.S. servicemen, and left countless others

severely injured, both physically and emotionally.  *Peterson*, 264 F. Supp. 2d at 58.

*Iranian Involvement in the Marine Barracks Bombing*

The testimony of Mahmoud establishes that the barracks bombing was undertaken by

members of Hezbollah.[2]  In *Peterson*, this Court found that the group Hezbollah "was formed

under the auspices of the government of Iran."  264 F. Supp. 2d at 51.  This determination was

based on the testimony of several expert witnesses in the *Peterson* trial.  First, Dr. Patrick

Clawson, a "widely-renowned expert on Iranian affairs," testified that Hezbollah was a creature

of the Iranian government:  "Hezbollah is largely under Iranian orders.  It's almost entirely

acting at the—under the order of the Iranians."  *Id*. at 51.  Second, Dr. Reuven Paz, "who has

researched Islamist terrorist groups over the last 25 years," stated that "at that time—even today,

but especially at that time, when Hezbollah was not yet formed as a strong group, it was totally

controlled by Iran and actually served mainly the Iranian interest."  *Id*. at 52.  Finally, Robert

Baer, "a case officer in the Directorate of Operations of the CIA," explained that, at the time of

---

[2] Hezbollah is synonymous with "Hizbollah," which is merely a "variant transliteration[] of the same name."  *Oveissi v. Islamic Republic of Iran*, 498 F. Supp. 2d 268, 273 n.3 (D.D.C. 2007) *rev'd on other grounds*, 573 F.3d 835 (D.C. Cir. 2009).

the 1983 bombing, Hezbollah was constituted by "a bunch of agents of Iran." *Id*. at 52–53 n.10.

Thus, the Iranian government was directly tied to the actions undertaken by the members of

Hezbollah in the attack on the U.S. Marine barracks.

In addition to evidence concerning Iran's role in creating and supporting Hezbollah,

plaintiffs in *Peterson* also presented testimony concerning an intercepted message from MOIS to

an Iranian official orderings attacks against U.S. Marines.  Admiral James A. Lyons—who at the

time was the Deputy Chief of Naval Operations for Plans, Policy and Operations—"routinely

received intelligence information about American military forces" during the period leading up

to the 1983 bombing.  *Id*. at 54.  Admiral Lyons testified about a message from MOIS to the

Iranian ambassador to Syria, directing the Ambassador to contact a terrorist leader and "instruct

him to have his group instigate attacks against the multinational coalition in Lebanon, and 'to

take a spectacular action against the United States Marines.'"  *Id*.  Additional evidence showed

that, following these instructions, this Ambassador to Syria then instructed an Iranian

Revolutionary Guard Corp officer to attend a meeting with Hezbollah operatives, and that the

attack on the Marine barracks was planned at that meeting.  *Id*. at 54–55.  Based on this

evidence, the Court finds that both Iran and MOIS played crucial and necessary roles in planning

and ordering the 1983 bombing.

Finally, testimony from explosives experts at the *Peterson* trial also points to Iranian

involvement in the attack.  At trial, experts from both the FBI and ATF "concluded that the

explosive material" in the bomb "was 'bulk form' pentaerythritol tetranitrate, or PETN."  *Id*. at

56.  Mr. Defenbaugh, the FBI investigator, then explained that the 'bulk form' of PETN, rather

than the manufactured form, "is not generally sold commercially," and that—at the time of the

attack—bulk form PETN "was manufactured within the borders of Iran."  *Id*. at 57.  And Warren

Parker, a forty-year veteran explosives expert for the Army and ATF, testified that "[t]hese are not things that you just go down to the drugstore and buy a pound of . . . . it is a state- or military-run factory that produces this type of material." *Id*. at 57–58.  Based on this testimony, the Court concurs and adopts its finding in *Peterson* that "Hezbollah and its agents received massive material and technical support from the Iranian government. . . . [I]t is highly unlikely that this attack could have resulted in such loss of life without the assistance of regular military forces, such as those of Iran." *Id*. at 58.

### *Iranian Support for Terrorism*

In addition to the direct support of Hezbollah for the purpose of carrying out the horrific bombing of the U.S. Marine barracks in 1983, the evidence presented at the *Peterson* trial demonstrates that Iran has also played a critical role in support for terrorism more generally.  At the *Peterson* trial, Dr. Clawson estimated that between 1983 and 1988, the Iranian government annually spent approximately $50 to $150 million financing terrorist organizations in the Near East.  *Id*. at 51.  In funding such operations, Iran uses MOIS to exercise operational control over groups such as Hezbollah.  *Id*. at 53.  And these activities have only intensified and worsened:  In an affidavit filed with this Court in *Valore*, Dr. Clawson estimates that today the "financial material support provided by Iran in support of terrorism is in the range of $300 million to $500 million a year."  700 F. Supp. 2d at 88.

### *Evan Fain III (and family)*

Plaintiff Evan Fain III was sleeping on the third floor of the barracks at the time of the bombing.  Aff. of Evan Fain III, ECF No. 20, at ¶ 4.  He suffered serious physical and psychological injuries, including traumatic brain injury, temporary paralysis from a back injury, a puncture wound, and later suffered post-traumatic stress disorder.  *Id.* at ¶ 5.  At the time of the

attack, he was married to plaintiff Maria Fain, who suffered extreme emotional distress because she did not know whether Evan was alive for two days. *Id.* at ¶ 8; Aff. of Maria Fain, ECF No. 24, at ¶ 6. He also had three children, who are all plaintiffs in this action: Maria Amosa, Evan Fain IV, and Joseph Edward Fain. *Id.* at ¶ 9. The children suffered extreme emotional distress as a result of the attack because they did not know whether their father was alive for two days after the bombing. Aff. of Evain Fain IV, ECF No. 21, at ¶ 3; Aff. of Joseph Edward Fain, ECF No. 22, at ¶ 3; Aff. of Maria E. Amosa, ECF No. 23, at ¶ 3; *see also* Depositions, ECF Nos. 25–29. The attack permanently impacted their family life and their relationship with their father. *Id.*

## IV.   CONCLUSIONS OF LAW

Based on these findings of fact, the Court reaches the following conclusions of law:

### A.    Jurisdiction

Subject to certain enumerated exceptions—including the state-sponsored terrorism exception—the FSIA simultaneously provides immunity to foreign states from suit and denies all U.S. federal and state courts jurisdiction over such actions. 28 U.S.C. § 1604. Under certain conditions, however, courts obtain original jurisdiction for suits against foreign states, and those states' general immunities are waived by operation of statute. Based on the evidence here, these conditions have been met.

#### 1.    Original Jurisdiction

The state-sponsored terrorism exception provides that federal courts possess original jurisdiction over suits against a foreign state only if (1) "money damages are sought," (2) "against a foreign state" for (3) "personal injury or death" that (4) "was caused" (5) "by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources . . . for such an act." *Id*. at § 1605A(a)(1).

Here, each of these prerequisites is met. First, plaintiffs have only identified monetary remedies in their Amended Complaint, ¶¶ 12–19, rendering this a suit involving only "money damages." Second, defendant Iran is plainly a foreign state. With respect to defendant MOIS, the FSIA defines foreign state to include "a political subdivision . . . or an agency or instrumentality of a foreign state." *Id.* at § 1603(a). Applying this definition, courts in this jurisdiction have been directed to ask whether an entity "is an integral part of a foreign state's political structure"; if so, that defendant is treated as a foreign state for FSIA purposes. *TMR Energy Ltd. v. State Prop. Fund of Ukraine*, 411 F.3d 296, 300 (D.C. Cir. 2005) (internal quotations omitted). Here, the evidence establishes that MOIS is a division of the state of Iran that acted as a conduit for the state's provision of funds to terrorist organizations, including Hezbollah. Defendant MOIS is thus a foreign state for purposes of these proceedings. *See Oveissi*, 498 F. Supp. 2d at 275 (finding MOIS to constitute a foreign state).

Third, the Amended Complaint contains claims for assault, battery, and international infliction of emotional distress. Am. Compl. ¶¶ 12-17. These claims are clearly actions for "personal injury" under § 1605(A)(a)(1). Fourth, the evidence establishes that defendant Iran founded Hezbollah for the purpose of undertaking attacks such as the 1983 bombing and funneled money to the terrorist organization through defendant MOIS, and also demonstrates that both defendants played necessary planning, logistical and support roles leading up the horrific attack. *See* Part III.B. This is more than sufficient to satisfy the FSIA's requirement that there be "some reasonable connection between the act or omission of the defendant and the damages which the plaintiff has suffered." *Valore*, 700 F. Supp. 2d at 66 (internal quotations omitted). Finally, the 1983 bombing constitutes an extrajudicial killing that occurred as a direct

and proximate result of defendants' conduct in providing financial and military assistance to the

attackers.  On the basis of these findings, the Court has jurisdiction over plaintiffs' claims.

### 2.    Waiver of Sovereign Immunity

While this Court's exercise of jurisdiction over this action is a necessary prerequisite to

moving forward, foreign states remain immune from suit absent a waiver of sovereign immunity.

Waiver of a foreign states' immunity can occur either by that state's own action or by operation

of statute.  The state-sponsored terrorism exception provides that such waiver occurs where (1)

"the foreign state was designated as a state sponsor of terrorism at the time of the act . . . or was

*so designated as a result of such act*, and . . . either remains so designated when the claim is filed

under this section or was so designated within the 6-month period before the claim is filed under

this section," (2) the claimant or the victim was, at the time of the act . . . a national of the United

States [or] a member of the armed forces [or] otherwise an employee of the Government of the

United States . . . acting within the scope of the employee's employment," and (3) "in a case in

which the act occurred in the foreign state against which the claim has been brought, the

claimant has afforded the foreign state a reasonable opportunity to arbitrate the claim."  28

U.S.C. § 1605A(a)(2)(i)–(iii) (emphasis added).

Here, the established facts warrant waiver of defendants' sovereign immunity as provided

by the FSIA.  First, Iran was designated by the U.S. Secretary of State as a sponsor of terrorism,

partially in response to the Beirut bombing.  U.S. Dep't of State, *Determination Pursuant to*

*Section 6(i) of the Export Administration Act of 1979—Iran*, 49 Fed. Reg. 2836, Jan. 23, 1984

(designating Iran upon concluding that "Iran is a country which has repeatedly provided support

for acts of international terrorism").  Second, serviceman Fain was a member of the United

States Marine Corps at the time of the attack.  Aff. of Evan Fain III, ECF No. 20, at ¶ 3.  Finally,

because the bombing occurred at the Marine barracks in Lebanon—and not Iran—the FSIA's requirement that defendants be given an opportunity to arbitrate this claim is inapplicable here. For these reasons, defendants' immunity is waived and they may be held liable for the attack which left 241 U.S. servicemen dead, and numerous others severely injured.[3]

## B.    Liability

FISA § 1605A(c) creates a federal private right of action for victims of state-sponsored terrorism.  Specifically, a plaintiff can seek to hold a foreign state liable for (1) "an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act" where (2) the act was committed, or the provision provided, by the foreign state or an official, employee, or agent of the foreign state if the act (3) "caused" (4) "personal injury or death" (5) "for which courts of the United States may maintain jurisdiction under this section for money damages."  28 U.S.C. §§ 1605A(a)(1) & (c).  As the Court has recently discussed at length, the third and fourth elements—causation and injury—"require plaintiffs to prove a theory of liability" in which plaintiffs articulate a justification for the recovery of the damages which they seek, generally expressed "through the lens of civil tort liability."  *Rimkus*, 750 F. Supp. 2d at 176.  Therefore, the Court will apply the facts of this case to each of these elements in turn.

### 1.    Act

On the basis of the evidence presented in *Peterson*, plaintiffs here have sufficiently established that defendants were responsible for the horrific attack on the U.S. Marine barracks

---

[3] Plaintiff served the Complaint on defendants through diplomatic channels on August 3, 2011, as authorized under FSIA, 28 U.S.C. § 1608(a)(4).  Return of Service/Affidavit, Oct. 19, 2011 [ECF No. 13].  The Court thus has personal jurisdiction over the defendants.  *See Stern v. Islamic Republic of Iran*, 271 F. Supp. 2d 286, 296 (D.D.C. 2003) (Lamberth, J.) (holding that personal jurisdiction exists over non-immune foreign state where service is effected under §1608).

in Beirut in 1983, which killed 241 U.S. servicemen and left hundreds of others severely

wounded.  The evidence concerning the actions of defendants Iran and MOIS demonstrates that

they are culpable both for the extrajudicial killing of U.S. citizens and for the provision of

material support to the members of Hezbollah participating in the bombing, in satisfaction of the

first element of liability under the federal cause of action.

FSIA defines extrajudicial killing by reference to Section 3 of the Torture Victim

Protection Act of 1991.  28 U.S.C. § 1605A(h)(7).  That Act defines an extrajudicial killing as

> [(1)] a deliberated killing [(2)] not authorized by a previous
> judgment pronounced by a regularly constituted court [(3)]
> affording all judicial guarantees which are recognized as
> indispensable by civilized peoples.

Torture Victim Protection Act of 1991 § 3(a), 28 U.S.C. § 1350 note.  The evidence presented in

*Peterson* establishes that, prior to the attack on the U.S. Marine barracks, orders were issued by

Iran, through MOIS and to the Iranian Ambassador to Syria, instructing him to direct members

of terrorist organizations—such as those that perpetrated the attack in Beirut—to take action

against U.S. peacekeeping forces stationed in Lebanon.  There is no evidence that this order was

sanctioned by any judicial body, and the order to use force against members of an international

peacekeeping force was in direct contravention of civil guarantees recognized as indispensable to

all free and civilized peoples.  Based on these findings, the barracks bombing constitute an

extrajudicial killing, undertaken by members of Hezbollah acting as agents for defendants Iran

and MOIS.

The FSIA declares that the concept of "material support or resources" is defined by

reference to the U.S. criminal code.  28 U.S.C. § 1605A(h)(3).  That definition states that support

> means any property, tangible or intangible, or service, including
> currency or monetary instruments or financial securities, financial
> services, lodging, training, expert advice or assistance, safehouses,
> false documentation or identification, communications equipment,

> facilities, weapons, lethal substances, explosives, personnel . . . and
> transportation, except medicine or religious materials.

18 U.S.C. § 2339A(b)(1).  The evidence presented at the *Peterson* trial demonstrates that during

the period leading up to the bombing, Iran founded and supported Hezbollah for the purpose of

advancing its own agenda.  Testimony of multiple expert witnesses establishes that Hezbollah

was essentially composed of a number of Iranian agents who were supported financially and

materially by Iran and MOIS.  And more specifically, the evidence shows that the explosive

materials used in the attack were of a type and grade that would only have been available to the

perpetrators of the attack through direct cooperation of the Iranian government, and that these

materials could only have been used as effectively as they were with military assistance and

training, which was provided by MOIS.  Taken together, these acts plainly constitute the

provision of material support for FSIA purposes.

### 2.      Actor

The Court has determined that defendants Iran and MOIS are responsible for the

provision of material support which led to the attack on the U.S. Marine barracks in Beirut.  In

addition, the evidence presented in *Peterson* establishes that Hezbollah acted generally as an

agent of Iran during this period, and that it was a direct order emanating from defendants which

prompted the barracks bombing.  Under such circumstances, defendants may be held vicariously

liable for the extrajudicial killing perpetrated by the bombers.  *See Murphy*, 740 F. Supp. 2d at

71–72 (holding that defendant foreign state may be held liable where Hezbollah agents "acted at

the behest and under the operational control of defendants").

### 3.      Theory of Recovery – Causation

The elements of causation and injury in the federal cause of action created by § 1605A

require FSIA plaintiffs "to prove a theory of liability" which justifies holding the defendants

culpable for the injuries that the plaintiffs allege to have suffered.  *Valore*, 700 F. Supp. 2d at 73;

*see also Rimkus*, 750 F. Supp. 2d at 175–76 ("[P]laintiffs in § 1605A actions . . . must articulate

the justification for such recovery, generally through the lens of civil tort liability.").  When

determining the contours of these theories, the D.C. Circuit has cautioned that while the "extent

and nature" of such claims "are federal questions," the FSIA "does not . . . authorize the federal

courts to fashion a complete body of federal law."  *Bettis v. Islamic Republic of Iran*, 315 F.3d

325, 333 (2003).  Based on the Circuit Court's guidance, District Courts in this jurisdiction "rely

on well-established principles of law, such as those found in Restatement (Second) of Torts and

other leading treatises, as well as those principles that have been adopted by the majority of state

jurisdictions" to outline the boundaries of these theories of recovery.  *In re Islamic Republic of*

*Iran Terrorism Litig.*, 659 F. Supp. 2d 31, 61 (D.D.C. 2009).  Here, plaintiffs articulate three

bases for relief: assault and battery, intentional infliction of emotional distress, and punitive

damages.  Am. Compl. ¶¶ 10–17.

### (i)        Assault and Battery

In Count I of the Amended Complaint, serviceman Fain asserts common law assault and

battery claims.  ¶¶ 12–13.  Iran is liable for assault in this case if, when it committed extrajudicial

killing or provided material support and resources therefor, (1) it acted "intending to cause a

harmful contact with ..., or an imminent apprehension of such a contact" by, those attacked and

(2) those attacked were "thereby put in such imminent apprehension."  *See Murphy*, 740 F. Supp.

2d at 73–75; Restatement (Second) of Torts § 21(1).  It is clear that defendants acted with intent

to cause harmful contact and the immediate apprehension thereof: acts of terrorism are, by their

very nature, intended to harm and to terrify by instilling fear of further harm. *Valore*, 700 F.

Supp. 2d at 76.  Accepting serviceman Fain's uncontroverted assertion that he did, in fact, fear

such harm because of the attack, Aff. of Evan Fain III, ECF No. 20, at ¶ 5, the Court concludes that defendants are liable for assault.

Serviceman Fain has also alleged battery. Iran is liable for battery in this case if, when it committed extrajudicial killing or provided material support and resources therefor, it acted "intending to cause a harmful or offensive contact with ..., or an imminent apprehension of such a contact" by, those attacked and (2) "a harmful contact with" those attacked "directly or indirectly result[ed]." Restatement (Second) of Torts § 13. Harmful contact is that which results in "any physical impairment of the condition of another's body, or physical pain or illness." Id. § 15. Again, it is clear that defendants acted with intent to cause harmful contact and the immediate apprehension thereof: acts of terrorism are, by their very nature, intended to harm and to terrify by instilling fear of such harm. *Valore*, 700 F. Supp. 2d at 77. Accepting serviceman Fain's uncontroverted assertions that he did, in fact, suffer severe physical injury from the blast, Aff. of Evan Fain III, ECF No. 20, at ¶ 5, the Court concludes that defendants are liable for battery.

### (ii)    Intentional Infliction of Emotional Distress

Plaintiffs set forth two Counts of intentional infliction of emotional distress. Am. Compl. Counts II–III. Count II is brought on behalf of serviceman Fain. *Id*. at ¶¶ 14–15. Count III is brought on behalf of serviceman Fain's wife Maria Fain and their children Maria Elena Amosa, Evan Fain IV, and Joseph Edward Fain. *Id*. at ¶¶ 14–17. Each Count sets forth similar factual allegations—that the attack on the U.S. Marine barracks caused the plaintiffs to suffer "extreme mental anguish." *Id*. at ¶¶ 15, 17. Each individual plaintiff seeks $20 million in compensatory damages for their emotional distress.

This Court and others have frequently addressed the intentional infliction of emotional distress theory following enactment of § 1605A. Relying principally on the Restatement, courts

have set for the following standard: "One who by extreme and outrageous conduct intentionally

or recklessly causes severe emotional distress to another is subject to liability for such emotional

distress, and if bodily harm to the other results from it, for such bodily harm." *Heiser v. Islamic*

*Republic of Iran*, 659 F. Supp. 2d 20, 26 (D.D.C. 2009) (citing Restatement (Second) of Torts §

46(1)). The scope of recovery under this theory is limited by two qualifications: the plaintiff

must be "a member of [the injured person's] immediate family" and must be "present at the

time." Restatement (Second) of Torts § 46(2)(a)–(b). The former qualification is of no

consequence here, as plaintiffs are either the spouse or children of the injured servicemen, and

thus fall within even the strictest definition of immediate family. *See Valore*, 700 F. Supp. 2d at

79 (noting that immediate family "is consistent with the traditional understanding of one's

immediate family" and includes "one's spouse, parents, siblings, and children").

      The issue of presence, however, warrants a bit more discussion. Plainly, none of the

plaintiffs in this action except for serviceman Fain were present in Beirut and witnesses to the

bombing of the U.S. Marine barracks. However, this Court has previously recognized that the

presence requirement is subject to a caveat—specifically, the Restatement "'expresses no

opinion as to whether there may not be other circumstances under which the actor may be subject

to liability.'" *Heiser*, 659 F. Supp. 2d at 26–27 (quoting Restatement (Second) of Torts § 46).

As the *Heiser* Court explained: "Terrorism [is] unique among the types of tortuous activities in

both its extreme methods and aims . . . . 'All acts of terrorism are by the very definition extreme

and outrageous and intended to cause the highest degree of emotional distress, literally, terror.'"

*Id.* at 27 (quoting *Stethem v. Islamic Republic of Iran*, 201 F. Supp. 2d 78, 89 (D.D.C. 2002)).

Thus, the Court concluded that a plaintiff "need not be present at the place of outrageous

conduct, but must be a member of the victim's immediate family." *Id.* Following this holding,

the *Valore* Court determined that the Beirut bombing qualified as an extreme and outrageous act sufficient to invoke this theory of recovery for non-present plaintiffs, 700 F. Supp. 2d at 79–80, and the Court shall do the same here.  Defendants are thus liable for the mental anguish and suffering that all plaintiffs have endured as a result of the attack on the U.S. Marine barracks in Beirut.

### (iii)    Punitive Damages

Plaintiffs set forth a final Count entitled "Punitive Damages."  Amended Complaint ¶¶ 18–19.  This Count alleges that defendants' actions "were intentional and malicious and in willful, wanton and reckless disregard of [plaintiffs'] . . . emotional well-being," and seeks an award of $600 million in punitive damages.  *Id.*

It is well established that punitive damages is not an independent cause of action.  *Botvin v. Islamic Republic of Iran*, 604 F.Supp.2d 22, 25 (D.D.C.2009) (internal quotations omitted). The Court grappled with claims solely for punitive damages under the FSIA in *Rimkus*, explaining that "a plaintiff must set forth an independent claim—generally sounding in intentional tort or strict liability—for which punitive damages may be an appropriate remedy." 750 F. Supp. 2d at 175 (emphasis own; citing Restatement (Second) of Torts § 908 cmt. c (1979)).  In *Rimkus*, the Court permitted the plaintiff's claim for punitive damages to go forward after determining that the plaintiff had "specifically alleged" a claim under FSIA by setting forth "each element in the federal cause of action provided by § 1605A."  *Id.*

Here, plaintiffs have not attempted to set forth a complete cause of action under Count IV, but rather rely primarily on the nature of defendants' conduct in this case to sustain their claims for punitive damages.  Am. Compl. ¶¶ 18–19.  This is plainly insufficient, *see Iacangelo*

*v. Georgetown Univ.*, 580 F.Supp.2d 111, 114 (D.D.C.2008) (dismissing "free-standing punitive damages claim as improperly pled"), and Count IV should be dismissed.

This is not to say, however, that plaintiff may not recover punitive damages in this action. As the *Rimkus* Court also made clear, where appropriate, punitive damages may be pursued as a remedy to an intentional tort.  750 F. Supp. 2d at 175–76; *see also Anderson v. Islamic Republic of Iran*, 753 F. Supp. 2d 68, 87 (D.D.C. 2010).  Here, as seen above, plaintiffs have set forth proper causes of action for intentional infliction of emotional distress—an intentional tort.  The Court will thus treat Count IV of the Amended Complaint as requesting the remedy of punitive damages in relief of the claims set forth in Counts I–III.  *See Park v. Hyatt Corp.*, 436 F.Supp.2d 60, 66 (D.D.C.2006) (noting that "punitive damages are not an independent cause of action" but treating plaintiff's claim for punitive damages "as part of an *ad damnum* clause").

### 4.      Personal Injury

This Court has already determined in Part IV.A.1 that plaintiffs have brought an action for "personal injury or death" by bringing claims for assault, battery, and intentional infliction of emotional distress.

### 5.      Jurisdiction

The Court has already determined in Part IV.A.1 that it is proper to exercise jurisdiction over defendants in this action, and that plaintiffs are only seeking monetary compensation.  This final element is thus satisfied, and defendants may be properly held liable under the federal cause of action embodied in § 1605A(c) for the 1983 bombing of the U.S. Marine barracks.

## V.      SPECIAL MASTER

Though the Court has determined that defendants are liable to plaintiffs under the FSIA, it also lacks evidence necessary to render an appropriate measure of damages.  In determining

the proper measure of damages, "[t]he courts of the United States may appoint special masters to hear damages claims brought under" the state-sponsored terrorism exception to the FSIA. 28 U.S.C. § 1605A(e)(1). Here, appointment of a special master would not impose undue expenses on any party and will not result in unreasonable delay—a prerequisite set forth in Fed. R. Civ. P. 53(a)(3). To the contrary, the use of special masters will affirmatively assist the Court in the efficient resolution of claims in this action.

As noted extensively above, this case is related to the *Peterson* case, and as a result it is subject to the administrative plan for special masters first set forth in that action. *See* Amended Administrative Plan Governing Appointed Special Masters 1, July 30, 2003, *Peterson*, No. 01 Civ. 2094 [29] (noting that the plan applies to "any other cases arising out of the October 23, 1983 occurrence at Beirut, Lebanon assigned to Judge Royce C. Lamberth in which special masters are appointed") ("Plan"). The Plan requires that plaintiffs provide the Court, within thirty days of the adoption of the Plan, with the potential special master's curriculum vitae, and that the potential special master submit an affidavit to the court disclosing whether there is any ground for his or her disqualification under 28 U.S.C. § 455, consistent with Rule 53. *Id*. at 2. Location and appointment of a special master is therefore the next step in this action.

## VI.    CONCLUSION

On October 23, 1983, plaintiffs and the world were horrified by the tragic and devastating destruction of the U.S. Marine barracks in Beirut, Lebanon. Thankfully, despite the efforts of Iran and MOIS to inflict of maximum devastation and death, servicemen Fain escaped with his life. Plaintiffs, however, still suffered greatly, both from the thought that serviceman Fain might be dead, and from fear arising from the knowledge that a close member of their family had been the victim of a horrific terrorist attack. The Court, however, lacks sufficient evidence to render

any determination concerning the appropriate amount of damages to be awarded to plaintiffs here.  Thus, the Court holds that defendants Iran and MOIS are legally liable to plaintiffs for the emotional and mental anguish they suffered as a result of the Beirut bombing, and directs plaintiffs to submit a motion for appointment of a special master to assist the Court in making an appropriate determination of damages.

A separate Order and Judgment consistent with these findings shall issue this date.

Signed by Royce C. Lamberth, Chief Judge, on April 20, 2012.